Filed 9/22/25  P. v. Barajas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTONIO BARAJAS,<br><br>    Defendant and Appellant. | F087575/F087577<br><br>(Super. Ct. Nos. 1062616, 1067548)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Kellee C. Westbrook, Judge.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Lewis A. Martinez and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Antonio Barajas was sentenced in 2005 to a term of 40 years to life for an attempted murder perpetrated when he was 17 years old; in 2007, he was sentenced to a term of 50 years to life for a first degree murder he committed when he was 18 years old. In 2023, appellant petitioned for recall and resentencing of both sentences under Penal Code[1] section 1170, subdivision (d) (section 1170(d)), which the trial court denied.

On appeal, we are asked to decide whether the denial of appellant's petition under section 1170(d) violates the equal protection guarantee of the Fourteenth Amendment pursuant to the reasoning of *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*). Section 1170(d)(1)(A) affords an opportunity for recall and resentencing only to those juveniles who were sentenced to an explicit term of life without parole (LWOP). *Heard* held that section 1170(d) violates equal protection principles to the extent it excludes from relief those juveniles sentenced to the functional equivalent of LWOP. (*Heard, supra*, at p. 612.)

In affirming the trial court's denial of the petition, we join in the reasoning articulated in *People v. Thompson* (2025) 112 Cal.App.5th 1058 (*Thompson*). For reasons we will explain below, we conclude appellant has *not* demonstrated that section 1170(d) violates equal protection principles as applied to juvenile offenders sentenced to 40 years to life, or as applied to young adult offenders sentenced to 50 years to life.

**FACTUAL BACKGROUND**

**I.      Underlying Convictions**

**A.      April 2003 Attempted Murder**

Based on a shooting in April 2003, when appellant was 17 years old, appellant was convicted in 2005 of attempted murder, assault with a firearm, and discharging a firearm

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

at an occupied motor vehicle. The jury also found that all three offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); appellant had personally discharged a firearm, causing death or great bodily injury as to counts 1 and 3 (§ 12022.53, subd. (d)), and he personally inflicted great bodily injury as to counts 2 and 3 (§ 12022.7, subd. (a)). The trial court imposed an aggregate sentence of 40 years to life as follows: 15 years to life for count 1 (§§ 187, 186.22, subd. (b)(1), 664), plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The court imposed concurrent determinate sentences of 16 and 17 years for counts 2 and 3, respectively.

### B. September 2003 Murder

Arising from another shooting that occurred in September 2003, appellant was convicted in 2007 of first degree murder (§ 187, subd. (a), count 1) committed when he was 18 years old. The jury found true a firearm enhancement (§ 12022.53, subd. (d)) and found the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The court sentenced appellant to an aggregate term of 50 years to life as follows: 25 years to life for the murder offense, plus 25 years to life for the firearm enhancement. The court also ordered this sentence to run consecutive to the sentence in the first case.

## II. Resentencing Petition Under Section 1170(d)

In 2023, appellant filed a petition to recall his sentences in both cases and for resentencing under section 1170(d)(1) and pursuant to *Heard*. Section 1170(d)(1)(A) provides, "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for [LWOP] has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." In *Heard*, the court held equal protection principles are violated where a juvenile offender sentenced to a term *functionally equivalent* to LWOP is precluded from relief under section 1170(d)(1)(A). (*Heard, supra*, 83 Cal.App.5th at pp. 633–634.)

3.

The trial court denied the petition, concluding appellant was ineligible under section 1170(d)(1) because he had not been sentenced to the functional equivalent of LWOP in his first case. With respect to the second case, the court concluded appellant was over 18 years of age when he committed the murder, and observed section 1170(d)(1)(A) provides no recall and resentencing relief for those who were 18 years or older when they committed the relevant offense. Appellant appeals.

## DISCUSSION

Appellant maintains the section 1170(d) resentencing process was "enacted to incorporate into the state's sentencing scheme the latest scientific understanding regarding the incomplete brain development of young people and its relationship to criminality and culpability." According to appellant, there is no rational reason for limiting section 1170(d) resentencing relief to juvenile offenders serving LWOP and excluding from relief those defendants serving otherwise lengthy life terms for offenses committed when under 18 years of age; as such, he maintains, the denial of his petition with respect to his 40-year-to-life sentence violates equal protection principles.

For similar reasons, appellant contends, there is no rational reason for section 1170(d) to deprive young adults of the same opportunity to prove they have matured and changed as juvenile defendants sentenced to LWOP; as a result, appellant argues, the trial court's denial of his petition with respect to his 50-year-to-life sentence also violated equal protection principles.

The Attorney General maintains appellant's 40-year-to-life sentence is distinguishable from the sentences considered in *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*) and is *not* the functional equivalent of LWOP because he will have a meaningful opportunity for release at 57 years of age. As a result, the Attorney General contends, appellant's equal protection challenge to section 1170(d) as applied to juvenile offenders serving a 40-year-to-life sentence fails. With respect to appellant's 50-year-to-life sentence, the Attorney General argues the Legislature could rationally limit relief

4.

under section 1170(d) to juveniles based on distinguishing characteristics of juveniles developmentally, and as the youngest, and presumably most deserving group of young offenders.

Appellant disputes application of the functional equivalency doctrine because it derives from *Heard*, where the court concluded at the first step of the traditional equal protection analysis that the defendant was similarly situated to juveniles sentenced explicitly to LWOP. (*Heard, supra*, 83 Cal.App.5th at pp. 627–631.) Because *People v. Hardin* (2024) 15 Cal.5th 834 (*Hardin*) dispensed with the similarly situated analysis in equal protection challenges to statutes like section 1170(d), appellant argues, functional equivalency as analyzed in *Heard* is no longer a relevant consideration. Rather, appellant contends, the only relevant question under *Hardin* is whether the Legislature had a rational reason for excluding offenders like appellant from the scope of section 1170(d). Moreover, even to the extent functional equivalency is relevant, *Contreras*'s formulation of the functional equivalency of LWOP would encompass appellant's sentences of 40 and 50 years to life.

To provide context for the parties' arguments, we begin with a summary of the relevant law.

I.      **Legal Background**

A.      **Functional Equivalence of LWOP in the Eighth Amendment Context**

The law governing juvenile punishment has undergone a sea change since appellant was sentenced in 2005 and 2006 "based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88.) "As a result of this shift, the punishment that could validly be imposed on juvenile offenders was curtailed. The changes in law also restricted prosecutors' authority to charge juveniles in adult criminal court." (*People v. Bagsby* (2024) 106 Cal.App.5th 1040, 1048 (*Bagsby*).)

Beginning with *Roper v. Simmons* (2005) 543 U.S. 551, 568, the United States Supreme Court held the Eighth Amendment categorically prohibits sentencing juvenile offenders to death.  In 2010, the nation's high court expanded *Roper* and held the Eighth Amendment also prohibits sentencing *nonhomicide* juvenile offenders to LWOP; only by giving such offenders "some realistic opportunity to obtain release" would punishment provided by the states comport with the Eighth Amendment.  (*Graham v. Florida* (2010) 560 U.S. 48, 82 (*Graham*).)  Two years later, although not extending *Graham*'s categorical LWOP ban to juvenile *homicide* offenders, the United States Supreme Court held the Eighth Amendment prohibits a sentencing scheme that makes LWOP a mandatory sentence for juvenile offenders convicted of homicide.  (*Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*).)  *Miller* outlined mitigating factors relating to youth that must be considered by the sentencing court before committing a juvenile homicide offender to prison for LWOP, and explained the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."  (*Id.* at p. 479.)

Two months after *Miller*, the California Supreme Court extended *Graham*, holding the Eighth Amendment prohibits sentencing *nonhomicide* juvenile offenders to a "term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence .…"  (*People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. omitted (*Caballero*).)  The court's analysis centered on *Graham* and its holding that the Eighth Amendment requires the state to afford a juvenile offender a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation .…'"  (*Caballero, supra*, at p. 266.)  *Caballero* explained *Miller* had emphasized that "'none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime specific.'"  (*Caballero, supra*, at p. 267.)  Rather, *Miller* had "made it clear that G*raham*'s 'flat ban' on [LWOP] sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence imposed in this case."  (*Caballero, supra*, at pp. 267–268, fn. omitted.)

6.

Sentenced to 110 years to life, *Caballero* explained the defendant would become parole eligible "over 100 years from now," and he "would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate." (*Id.* at p. 268.)

After the United States Supreme Court's decisions in *Graham* and *Miller*, our Legislature enacted Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill 9) that added subdivision (d)(2) to section 1170; the added subdivision became effective January 1, 2013, and created a recall and resentencing provision for juveniles sentenced to an explicit term of LWOP.  (See Stats. 2012, ch. 828, § 1.)  The statute permitted a resentencing mechanism for those defendants who were under the age of 18 years at the time of the commission of their offenses and who were sentenced to LWOP.  In the process of passing the bill, a legislative report included comments from the bill's author and supporters that "sentencing minors to die in prison is barbaric" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 2), and discussed that the proposed remedy of recall and resentencing would, if deemed appropriate by the sentencing judge, "result in a life sentence, but one with the possibility of parole" (*ibid.*).  Under the statute's new provision, a defendant was permitted to file a petition requesting recall and resentencing with the sentencing court after having been incarcerated for 15 years.  (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A).)[2]

Then, effective January 1, 2014, the Legislature passed Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill 260) and added sections 3051, 3046, subdivision (c), and 4801, subdivision (c) to the Penal Code "'to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*.'"  (*Heard, supra*, 83 Cal.App.5th at

---

[2]    In 2021, section 1170, subdivision (d)(2) was renumbered as subdivision (d)(1).  (Stats. 2021, ch. 731, § 1.3.)

p. 619; see § 3051, subd. (b)(1)–(3), added by Stats. 2013, ch. 312, § 4.)  Section 3051 requires the Board of Parole Hearings to conduct a youthful offender parole hearing "at specified times during the incarceration of certain youthful offenders."  (*People v. Sorto* (2024) 104 Cal.App.5th 435, 443–444 (*Sorto*).)  Although section 3051, as originally enacted, created a schedule of youth offender parole hearings for juvenile offenders sentenced to a determinate term, a term of less than 25 years to life, or a life term of 25 years to life, it provided no parole hearing for juvenile offenders sentenced to LWOP.  (*Heard, supra*, at p. 619 & fn. 8.)

The California Supreme Court considered the effect of Senate Bill 260 on a juvenile's claim of an Eighth Amendment violation in sentencing.  (*People v. Franklin* (2016) 63 Cal.4th 269 (*Franklin*).)  In *Franklin*, a 16-year-old defendant shot and killed another teenager, and was convicted of first degree murder with a firearm enhancement; he was sentenced to two consecutive terms of 25 years to life—i.e., 50 years to life.  (*Id.* at p. 271.)  *Franklin* held that, "just as *Graham* applies to sentences that are the 'functional equivalent of a [LWOP] sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences."  (*Id.* at p. 276.)  *Franklin* concluded, however, that the availability of a youth offender parole hearing under section 3051 mooted the defendant's Eighth Amendment challenge to his sentence under *Miller*.  (*Franklin, supra*, at pp. 279–280.)  Although the defendant remained bound by his original sentence, the court explained, by operation of Senate Bill 260, the defendant "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration.  Such a sentence is neither LWOP nor its functional equivalent.  Because [the defendant] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here."  (*Franklin, supra*, at pp. 279–280.)

Subsequently, in 2017, our Supreme Court held that section 1170(d) was an inadequate statutory mechanism to cure an error under *Miller*.  (*In re Kirchner* (2017) 2 Cal.5th 1040, 1054–1055.)  The court explained that section 1170(d) provided "only a

selective and qualified remedy … premised on an inquiry that may, but does not necessarily, overlap with the one demanded under *Miller*." (*Kirchner, supra*, at pp. 1054–1055.) After *Kirchner*, the Legislature amended section 3051 to add subdivision (b)(4), which provides juveniles sentenced to LWOP a youth offender parole hearing during their 25th year of incarceration. (§ 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5.) Nevertheless, the Legislature did not repeal section 1170(d).

Months after section 3051 was amended, our Supreme Court again considered the legality of juvenile sentences under the Eighth Amendment for nonhomicide offenses in *Contreras*. Although not sentenced to the 110-year-to-life term in *Caballero*, two juveniles had been sentenced to 50 and 58 years to life for One Strike nonhomicide offenses and were ineligible for youth offender parole hearings under section 3051. (*Contreras, supra*, 4 Cal.5th at p. 359.) Eschewing an actuarial approach to determine whether the sentence amounted to de facto LWOP, the court centered its analysis on *Graham*'s Eighth Amendment requirement that nonhomicide juvenile offenders must be given "'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Contreras, supra*, at p. 367, quoting *Graham, supra*, 560 U.S. at p. 75.)

Through the lens of *Graham*, the court reasoned a lawful sentence under the Eighth Amendment must "recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability'"; "offer 'hope of restoration'"; offer "'a chance to demonstrate maturity and reform'"; provide a "'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society'"; and offer "the juvenile offender an 'incentive to become a responsible individual.'" (*Contreras, supra*, 4 Cal.5th at p. 367, quoting *Graham, supra*, 560 U.S. at pp. 74, 70, 79.) Given these guidelines, *Contreras* held a sentence of 50 years to life is functionally equivalent to LWOP for a juvenile nonhomicide offender because it does not provide the opportunities *Graham* requires. *Contreras* explained *Graham* "envisioned more than the mere act of release or a de

minimis quantum of time outside of prison.…  Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." (*Contreras, supra*, at p. 368.)

**B.     Eighth Amendment Concerns in the Equal Protection Context**

After *Contreras*, our high court considered constitutional questions about youth offender parole opportunities provided under section 3051 in *Hardin, supra*, 15 Cal.5th 834 and *People v. Williams* (2024) 17 Cal.5th 99 (*Williams*).  In *Hardin,* the defendant was serving an LWOP sentence for a special circumstance murder he committed at age 25.  (*Hardin, supra*, at p. 839.)  Although section 3051 permitted youth offender parole hearings for most offenders incarcerated for a crime they committed between ages 18 and 25, the statute excluded from youth offender parole hearings those serving LWOP for a crime they committed after the age of 18.  (*Hardin, supra*, at pp. 838–839.)  The defendant argued section 3051 violated the Fourteenth Amendment's equal protection guarantee by excluding from early parole opportunities young adult offenders sentenced to LWOP for special circumstance murder, but extending parole opportunities to young adult offenders serving parole-eligible life sentences for other crimes.  Our high court ultimately concluded the Legislature had a rational basis for the exclusion of young adults sentenced to LWOP based on its concerns about culpability and the appropriate level of punishment for certain very serious crimes.  (*Hardin, supra*, at pp. 853–864.)

Notably, the court rejected the defendant's argument premised on the functional equivalence doctrine:  a young adult offender sentenced to a lengthy term-of-years sentence that is functionally equivalent to LWOP would be entitled to a youth offender parole hearing, while a young adult offender serving an explicit sentence of LWOP would not. (*Hardin, supra*, 15 Cal.5th at pp. 863–864.)  The appellate court below had concluded this distinction was irrational because it permitted parole hearings for those defendants with lengthy term-of-years sentences who perhaps had committed multiple violent crimes and were, in some cases, sentenced to the functional equivalence of

LWOP, while denying a parole opportunity to those defendants explicitly sentenced to LWOP, perhaps for only a single crime. (*Id.* at p. 842.) The appellate court reasoned the seriousness of the offender's crimes was only a superficially plausible justification for the distinction. (*Ibid.*) In raising this culpability issue before the Supreme Court, the defendant noted the high court had previously described aggregate sentences that fix parole eligibility outside an offender's life expectancy as the functional equivalence of LWOP, and essentially argued a sentence functionally equivalent to LWOP could involve the same degree of culpability as those sentenced to LWOP, making a distinction based on culpability an irrational one. (*Id.* at p. 863.)

In rejecting this argument, our high court explained it had "employed that [functional equivalence] description in the context of identifying the category of juvenile offenders to whom the Eighth Amendment limitations on [LWOP] sentences apply; for that purpose, what matters is only whether the sentence, by its nature, forecloses any realistic chance for a juvenile offender to rejoin society. [Citation.] We have not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for all purposes. Nor, more specifically, have we suggested that a set of crimes punishable by a lengthy term-of-years sentence is necessarily more culpable, or equivalent in culpability, to a single crime for which the law prescribes a sentence of [LWOP]." (*Hardin, supra*, 15 Cal.5th at pp. 863–864.)

Finally, in *Williams*, our high court again considered an equal protection challenge to section 3051—this time based on its exclusion of all youth offenders sentenced under the One Strike law. (*Williams, supra*, 17 Cal.5th at pp. 112–113.) The defendant argued there was no rational basis to exclude One Strike offenders, which involve nonhomicide offenses, but not those convicted of first degree murder from parole eligibility. (*Id.* at p. 125.) The defendant's argument was premised, in part, on *Graham*'s statement "'that homicide offenses differ 'in a moral sense' from nonhomicide offenses in terms of '"their

""severity and irrevocability.""" (*Williams, supra*, at p. 125, quoting *Graham, supra*, 560 U.S. at p. 69.)

The high court observed "[t]his argument based on the comparative seriousness of crimes, however, is premised on concerns relevant in the context of Eighth Amendment challenges to the death penalty and other severe criminal penalties, such as juvenile LWOP; such concerns do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard." (*Williams, supra*, 17 Cal.5th at p. 131.) The court acknowledged section 3051 "was crafted to 'bring juvenile sentencing in conformity with *Miller*, *Graham* and *Caballero*' [citation], and to that end, Eighth Amendment 'protections outlined in *Miller*' are featured in this provision. [Citation.] However, despite 'language echoing the holdings of these cases' [citation], this equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile LWOP sentencing." (*Williams, supra*, at p. 131.) Based on recidivism concerns and that the aggravated nature of their offenses diminished their prospects for rehabilitation, the court ultimately concluded the Legislature "had a rational reason to categorically exclude young adult One Strike offenders, but not young adults convicted of non-special-circumstance murder, from early parole consideration under section 3051." (*Id.* at p. 133.)

## C. Equal Protection Challenges to Section 1170(d) and Sentences Functionally Equivalent to LWOP

The concept of functional equivalence of LWOP arose again in the context of equal protection challenges to section 1170(d). To reiterate, section 1170(d) permits a defendant who was under the age of 18 at the time of the commission of the offense for which the defendant was sentenced to LWOP and has been incarcerated for at least 15 years, to submit a petition for recall and resentencing to the sentencing court. (§ 1170(d)(1)(A).)

In *Heard*, decided before *Hardin* or *Williams*, the court addressed an equal protection challenge to section 1170(d) and its exclusion of juveniles who were not sentenced to an explicit term of LWOP. The defendant, who had been sentenced to a term of 103 years to life, argued his sentence was the functional equivalent of LWOP, and if section 1170(d)(1) was not interpreted to apply to his sentence, then it violated his right to equal protection. As matter of statutory construction, the court first determined the plain language of section 1170(d)(1)(A) limited eligibility for recall and resentencing to juvenile offenders sentenced explicitly to LWOP. (*Heard, supra*, 83 Cal.App.5th at p. 626.) Turning to the equal protection challenge, the court concluded the defendant was similarly situated to those offenders sentenced explicitly to LWOP because his sentence was "the functional equivalent" of LWOP. (*Id.* at p. 629.) In making this determination, the court embraced no specific analytical method for determining what term-of-years sentence constituted the functional equivalent of LWOP; instead, the court relied on *Caballero*'s application of functional equivalency and explained the defendant would have to serve 103 years before becoming parole eligible, which "constitutes a de facto [LWOP] sentence." (*Heard, supra*, at p. 629.)

On the second prong of the analysis, the court found it could "conceive of no legitimate reason for making juvenile offenders sentenced to explicit [LWOP] terms eligible to seek resentencing but not juvenile offenders sentenced to the equivalent of a [LWOP] sentence." (*Heard, supra*, 83 Cal.App.5th at p. 632.) The court reasoned the Legislature could not rationally base the distinction on the excessiveness of an LWOP sentence because the same concern applies to those with a functionally equivalent term-of-years sentence. (*Ibid.*) Differential treatment also could not be justified, the court reasoned, by differences in the relative culpability of each group. The statute had the "incongruous effect" of extending sentencing leniency (resentencing) to those offenders generally regarded as the least deserving of it—e.g., juveniles convicted of first degree murder whose cases involve a special circumstance finding whose punishment is explicit

13.

LWOP. (*Id.* at p. 633.) The court also considered, and rejected, whether the Legislature might have viewed a juvenile whose multiple offenses caused a lengthy term-of-years sentence as more deserving of severe punishment. The court pointed out section 1170(d)(1)(A) includes those with explicit LWOP sentences regardless of whether they are convicted of other additional offenses, so the number of offenses theoretically committed by each group of offenders (LWOP offenders versus de facto LWOP offenders) failed to justify their disparate treatment. (*Heard, supra*, at p. 633.)

Two years later, in *Sorto*, the court reviewed the denial of a section 1170(d) petition where the defendant had been sentenced to a determinate term of 10 years, plus an indeterminate term of 130 years to life. (*Sorto, supra*, 104 Cal.App.5th 435.) The appellate court confirmed *Heard*'s equal protection analysis, and concluded neither *Hardin* nor *Franklin* undercut it.[3] Consistent with *Heard*, the court found there was no rational basis for section 1170(d) to exclude from relief those juveniles serving sentences that were the functional equivalent of LWOP. The court rejected the Attorney General's arguments the Legislature had a rational basis to distinguish LWOP as a response to *Graham*; or based on moral principles; empirical facts; fiscal concerns; and relative culpability. (*Sorto, supra*, at pp. 450–454.)

---

[3] In *People v. Ortega* (2025) 111 Cal.App.5th 1252, review granted September 17, 2025, S292070, our colleagues in the Fourth District Court of Appeal, Division Three, parted company with *Heard* and *Sorto* regarding how eligibility for a youth offender parole hearing under section 3051 affects an equal protection challenge to section 1170(d). (*Ortega, supra*, at pp. 1263–1264, review granted.) Relying on *Franklin*, the court in *Ortega* reasoned that because the defendant was eligible for a section 3051 youth offender parole hearing, his sentence of 42 years to life had been converted by operation of law to a sentence of 25 years to life. Based on this, the court concluded the defendant's sentence was not the functional equivalent of LWOP, and the defendant's equal protection challenge to section 1170(d) was moot. (*Ortega, supra*, at pp. 1264–1265, review granted.) Prior to *Ortega*, *Heard* and *Sorto* had declined to adopt similar reasoning and had concluded that, although section 3051 may change how a defendant's sentence currently operates, section 1170(d)'s plain language requires only that a defendant "was sentenced" to an LWOP term. (*Heard, supra*, 83 Cal.App.5th at p. 629; accord, *Sorto, supra*, 104 Cal.App.5th at pp. 447–448.)

After *Sorto*, the Fourth District Court of Appeal in *Bagsby* rejected the Attorney General's argument that *Heard* was wrongly decided, and concluded a sentence of 107 years to life for offenses committed when the juvenile was 15 years old was the functional equivalent of LWOP, and there was no rational basis for section 1170(d) to differentiate between LWOP and those sentenced to de facto LWOP. (*Bagsby, supra*, 106 Cal.App.5th at pp. 1054–1067.)

Like *Caballero*, these section 1170(d) cases (*Heard*, *Sorto* and *Bagsby*) involved term-of-years sentences with a parole eligibility date that was unquestionably beyond the juvenile's natural life span. None of these cases confronted how functional equivalence should be assessed when a defendant's term-of-years sentence could potentially offer a parole opportunity *inside* the juvenile's natural life. Courts have varied as to the rationale for making this determination in the equal protection context and exactly where the line should be drawn for functional equivalence when a term-of-years sentence offers an opportunity for parole that is probably, or at least possibly, inside the juvenile's natural life expectancy.

For example, in *People v. Olmos* (2025) 109 Cal.App.5th 580, our colleagues in the Second District Court of Appeal, Division Five, concluded a sentence of 33 years to life is not the functional equivalent of LWOP for purposes of section 1170(d) pursuant to *Heard*'s equal protection analysis. Accepting *Heard*'s equal protection analysis arguendo, the court reasoned a 33-year-to-life sentence was readily distinguishable from the sentence of 103 years to life in *Heard (Heard, supra*, 83 Cal.App.5th at p. 629), 140 years to life in *Sorto* (*Sorto, supra*, 104 Cal.App.5th at pp. 439–440) and was far shorter than the 50- and 58-year sentences imposed on the juveniles in *Contreras* (*Contreras, supra*, 4 Cal.5th at p. 356). (*Olmos, supra*, at p. 583.)

In *Munoz*, a split panel of our colleagues in the Second District Court of Appeal, Division Seven, concluded that a 50-year-to-life term for a juvenile homicide offender is not the functional equivalent of LWOP in the context of an equal protection challenge to

15.

section 1170(d).  The majority distinguished *Heard*, *Sorto*, and *Bagsby* because those cases involved minimum parole eligibility dates far greater than 50 years.  (*People v. Munoz* (2025) 110 Cal.App.5th 499, 510–512, review granted June 25, 2025, S290828 (*Munoz*).)  Despite that *Caballero*, a nonhomicide Eighth Amendment case, "gave some guidance" about how to ascertain functional equivalency, *Munoz* concluded it was not controlling in the equal protection context and similarly distinguishable.  (*Munoz, supra*, at p. 508, review granted.)  *Caballero*, like *Heard*, *Sorto*, and *Bagsby*, considered a defendant with parole eligibility after more than 100 years—a sentence that obviously would not provide a meaningful opportunity to secure release during the juvenile's expected lifetime.  *Munoz* reasoned that unlike the defendant in *Caballero*, Munoz would be 65 years old when he became eligible for parole, and thus *would* have a realistic opportunity to obtain release from prison during his expected lifetime.  (*Munoz, supra*, at p. 508, review granted.)

In declining to consider various extra-record evidence showing Munoz would likely die in prison before reaching his parole eligibility date, the court explained the data was not presented to the trial court, and it would not evaluate its untested validity.  (*Munoz, supra*, 110 Cal.App.5th at pp. 508–509, review granted.)  The court also noted it was the function of the Legislature, not the courts, to sift through studies and research to make policy decisions.  (*Id.* at p. 509, review granted.)  The *Munoz* majority also reasoned that *Contreras*'s formulation of functional equivalency did not govern the analysis because it was an Eighth Amendment case in a nonhomicide context.  (*Munoz, supra*, at pp. 510–511, review granted.)

The dissent in *Munoz* maintained *Contreras*'s reasoning "must inform" the functional equivalence analysis for equal protection purposes as section 1170(d) "was enacted in response to the principles articulated in *Graham*[*, supra,*] 560 U.S. 48 … — the decision at the heart of *Contreras*."  (*Munoz, supra*, 110 Cal.App.5th at p. 513, review granted (dis. opn. of Feuer, J.).)  The dissent relied on various studies and statistics cited

by the defendant and amici curiae filings, including those showing the average age of death of California inmates between 2010 and 2012 was 54–55 years of age (*id.* at p. 515, review granted); and how juveniles are disproportionately subjected to childhood trauma that is linked to higher mortality rates (*id.* at p. 517, review granted). The dissent concluded that a term of 50 years to life imposed on a 15- or 16-year-old "is the functional equivalent of an LWOP sentence because a substantial percentage of juvenile offenders will die in prison or be released at the end of their lifetimes, without a meaningful opportunity to become productive members of society." (*Id.* at p. 517, fn. omitted, review granted.)

Subsequently, relying on *Contreras*, our colleagues in the Second District Court of Appeal, Division Five, concluded a 50-year-to-life sentence for a juvenile homicide offender is functionally equivalent to LWOP for equal protection purposes under section 1170(d). (*People v. Cabrera* (2025) 111 Cal.App.5th 650, 653.) A separate concurring statement explained that, "[w]ere the slate clean, I would defer to our Legislature's decision as to where to draw the line between entitlement and nonentitlement to relief under … section 1170, subdivision (d)(1)(A)—at least in a case, like this one, where the question presented is whether there is a rational basis to distinguish a sentence of 50 years to life from a [LWOP] sentence. However, our Supreme Court's holding in *People v. Contreras* (2018) 4 Cal.5th 349, 369 … is, in my view, inescapable and indistinguishable." (*Id.* at p. 654 (conc. opn. of Hoffstadt, P.J.).)

Finally, and most recently, our colleagues in the Second District Court of Appeal, Division Three, agreed with the majority in *Munoz* that section 1170(d)'s exclusion of a juvenile sentenced to 50 years to life for a homicide offense did not violate equal protection principles. (*Thompson, supra*, 112 Cal.App.5th at p. 1072 & fn. 4.) *Thompson* explained that *Contreras* had limited the question before it regarding functional equivalence "'*to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders* .…'" (*Thompson, supra*, at p. 1072, quoting *Contreras*,

17.

*supra*, 4 Cal.5th at p. 364.)  *Thompson* found this to specifically tether the functional equivalence question before *Contreras* to the Eighth Amendment, particularly in light of the high court's statements in *Hardin* and *Williams* "rejecting attempts to collapse the separate Eighth and Fourteenth Amendment analyses into one."  (*Thompson, supra*, at p. 1073, citing *Williams, supra*, 17 Cal.5th at p. 131 & *Hardin, supra*, 15 Cal.5th at p. 863.)

Thus, *Thompson* explained, because *Contreras* had addressed functional equivalence under Eighth Amendment standards, and *not* under the equal protection guarantee of the Fourteenth Amendment, its Eighth Amendment concerns in determining functional equivalency did not extend to an equal protection challenge under section 1170(d).  For purposes of equal protection, *Thompson* explained, rather than "asking whether a 50-year-to-life term functions like [LWOP] with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders, we must ask whether "'a statutory distinction [between LWOP and a 50-year-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection."'"  (*Thompson, supra*, 112 Cal.App.5th at p. 1074, quoting *Williams, supra*, 17 Cal.5th at p. 123 & citing *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted.)

Turning to the equal protection analysis, *Thompson* noted that although Senate Bill 9's legislative history indicates *Graham* violations and cruel or disproportionate sentences imposed on juveniles were among the Legislature's general considerations in enacting section 1170(d), "it was expressly concerned about juveniles being sentenced to *die* in prison."  (*Thompson, supra*, 112 Cal.App.5th at p. 1075.)  After examining various legislative reports analyzing Senate Bill 9, the court concluded those materials suggested "the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences.  Instead, a specific goal was to provide an opportunity for juvenile offenders whose sentences

ensured they would die in prison." (*Thompson, supra*, at p. 1076.) *Thompson* pointed out the defendant had not shown these concerns stated in the legislative materials would have applied equally to sentences of 50 years to life as to sentences of LWOP. (*Ibid.*)

*Thompson* also found the Legislative history established the Legislature intended to proceed incrementally with respect to addressing the larger problem of excessive punishment for juveniles. (*Thompson, supra*, 112 Cal.App.5th at p. 1076.) Senate Bill 9 was described as a "'modest and narrowly focused piece of legislation'" (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11), which financial reports indicated would apply to only 293 California inmates (Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, pp. 1, 2). At the time of enactment, *Thompson* reasoned, the Legislature could reasonably have considered LWOP to be the most severe and unjust punishment imposed on juvenile offenders, and it could have rationally concluded that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, at p. 1077.) In light of that objective, the court reasoned it was rational for the Legislature to distinguish only juveniles sentenced to LWOP as compared to those with terms of 50-year-to-life because, prior to enactment of section 3051, it was only juveniles sentenced to LWOP who had a "100 percent chance of dying in prison." (*Thompson, supra*, 112 Cal.App.5th at p. 1078.)

The court also rejected the defendant's arguments of irrationality with respect to culpability, pointing to rational bases the Legislature may have had to benefit LWOP juveniles who, unlike those with lengthy term-of-years sentences, could not benefit from conduct credit and were deprived of educational and rehabilitative opportunities, even if they had theoretically committed more egregious offenses than those serving lesser term-of-years sentences. (*Thompson, supra*, 112 Cal.App.5th at p. 1080.) Finally, *Thompson* joined *Munoz* in acknowledging that tough questions remained regarding sentences with

parole eligibility closer to the end of a juvenile's natural life expectancy, but noted its review was limited to the specific question before it. (*Thompson, supra*, at p. 1081.)

Against this backdrop, we turn to the specific equal protection challenge appellant makes with respect to his sentences of 40 years to life for crimes committed as a juvenile and 50 years to life for a crime committed as a young adult.

## II. Analysis

### A. Equal Protection Principles and Standard of Review

"The equal protection clause of the Fourteenth Amendment to the United States Constitution provides that no state may 'deny to any person within its jurisdiction the equal protection of the laws.'" (*Hardin, supra,* 15 Cal.5th at p. 847, fn. omitted, quoting U.S. Const., 14th Amend.) "This provision is 'essentially a direction that all persons similarly situated should be treated alike.' [Citation.] 'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' ([*People v.*] *Chatman* [(2018)] 4 Cal.5th [277,] 288.)" (*Hardin, supra*, at p. 847.)

The justification required to satisfy equal protection hinges on the type of unequal treatment at issue. (*Hardin, supra*, 15 Cal.5th at p. 847.) Heightened scrutiny is applied when a challenged statute or regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and these classifications require greater justification for the differential treatment. (*Ibid.*, citing *People* v. *Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).) However, when a statute involves none of these suspect classifications or fundamental rights, as a general rule the legislation is presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest. (*Hardin, supra*, at p. 847.) "A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' (*Chatman*, at pp. 288–289.)" (*Ibid.*)

"Traditionally, the rational basis test has been described as a two-part inquiry, with courts "'first ask[ing] whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner,'" and then "'consider[ing] whether the challenged classification" is adequately justified,' i.e., whether it "'bears a rational relationship to a legitimate state purpose.'" (*Hardin, supra,* 15 Cal.5th at p. 848.)" (*Williams, supra*, 17 Cal.5th at p. 124.) In *Hardin*, the California Supreme Court held that "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question." (*Hardin, supra*, at p. 850.) That holding applies to this case where the issue presented is whether section 1170(d)(1)(A) violates equal protection by excluding young adults convicted of lengthy term-of-years sentences for recall and resentencing, while juveniles convicted of LWOP or its functional equivalent are eligible for such relief.

In this situation, we are to "presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' [Citation.] The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissibly than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.'" (*Hardin, supra*, 15 Cal.5th at p. 852, fn. omitted.)

The constitutional validity of a statute is a question of law reviewed de novo. (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474.)

21.

**B.** ***Contreras* and the Framework for Analyzing an Equal Protection Challenge to Section 1170(d)**

Appellant contends that whether a sentence is de facto LWOP was originally part of *Heard*'s similarly-situated equal protection analysis, but that step—including the functional equivalency question—is no longer applicable under *Hardin*. Highlighting the cognitive development research that precipitated, at least in part, many of the changes to juvenile sentencing law, including section 1170(d), appellant contends the Legislature had no rational basis to exclude section 1170(d) recall and resentencing relief to any juvenile offender who received lengthy term-of-years sentences, "especially those of 25 years to life or longer, such as [appellant]," regardless of whether the sentence constitutes de facto LWOP.

The Attorney General disputes that the functional equivalency assessment is irrelevant under the more streamlined equal protection analysis embraced in *Hardin*, and points out that *Hardin* explicitly cautioned that its dispensation of the similarly situated prong of the equal protection analysis for certain types of challenges should not be interpreted as raising doubts about precedent utilizing the similarly situated inquiry. Relying on *Contreras,* the Attorney General argues that a juvenile like appellant, sentenced to 40 years to life, with a parole opportunity in their late 50's, still has a meaningful opportunity to reintegrate into society within his or her expected lifetime. Thus, the sentence is not the functional equivalent of LWOP; and, as a result, although the Attorney General does not elaborate on this point, there is a rational basis for section 1170(d) to exclude from relief those who are not serving LWOP or its functional equivalent.

The Attorney General's argument imports *Contreras*'s Eighth Amendment formulation of functional equivalence and applies it in a manner that generally mirrors *Heard*'s traditional two-step equal protection analysis. *Heard* relied on *Caballero*—an Eighth Amendment case—for its formulation of functional equivalence to LWOP to

conclude a term of 103 years to life was functionally equivalent to LWOP such that the two groups were similarly situated. (*Heard, supra*, 83 Cal.App.5th at p. 629.) Yet, different from the 110-year-to-life sentence in *Caballero* that clearly exceeded natural life expectancy and lent itself to a "straightforward" conclusion it was functionally equivalent to LWOP in an actuarial sense, the question of functional equivalence presented in *Contreras* was different. (*Contreras, supra*, 4 Cal.5th at p. 364.)

In *Contreras*, the term-of-years sentences did not clearly exceed the offenders' respective lifespans, and presented a more complex question about whether such sentences nonetheless "impinge[d] on the same substantive concerns that make the imposition of LWOP on juvenile nonhomicide offenders impermissible under the Eighth Amendment." (*Contreras, supra*, 4 Cal.5th at p. 364.) The functional equivalence issue addressed in *Contreras* was shaped around Eighth Amendment concerns and expressly limited to whether "a term-of-years sentence may function like LWOP *with respect to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders ….*" (*Contreras, supra*, at p. 364.) *Contreras* answered this question under the lens of *Graham*, analyzing whether sentences of 50 and 58 years to life provided the defendants with a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Contreras, supra*, at p. 367, quoting *Graham, supra*, 560 U.S. at p. 75.)

Here, unlike *Caballero* or *Heard*, appellant's sentence of 40 years to life offers parole eligibility at age 57 and allows for an opportunity for release that is not clearly outside his natural lifetime. Although appellant's sentence is more akin to the sentences confronted in *Contreras*, the functional equivalence analysis in *Contreras* was built on, and expressly tethered to, Eighth Amendment concerns that do not necessarily extend to an equal protection analysis under the Fourteenth Amendment. As observed in our Supreme Court's recent equal protection opinions, Eighth Amendment concerns "do not necessarily establish whether a Legislature's classification violates equal protection under

23.

a rational basis standard" (*Williams, supra*, 17 Cal.5th at p. 131), and our high court has "not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for all purposes" (*Hardin, supra*, 15 Cal.5th at p. 863). We understand from these cases that *Contreras*'s formulation of functional equivalency, particularly with its focus on Eighth Amendment concerns, does not necessarily apply to other legal contexts and analyses without regard for the nature of the legal question presented.

The Eighth Amendment's ban on cruel and unusual punishments "flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense'"; the Eighth Amendment's meaning is drawn from "'evolving standards of decency that mark the progress of a maturing society,'" which "must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419, 420.) Assessing punishment under the Eighth Amendment "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." (*Graham, supra*, 560 U.S. at p. 67.)

Differently, the Fourteenth Amendment's equal protection guarantee is meant to "'ensure[] that the government does not treat a group of people unequally without some justification'"; it "'confers no substantive rights and creates no substantive liberties'"; its function "'is simply to measure the validity of classifications created by state laws.'" (*Williams, supra*, 17 Cal.5th at p. 122.) Appellant does not make a claim under the Eighth Amendment; he challenges section 1170(d) on equal protection grounds under the Fourteenth Amendment. Rather than analyzing a sentence's functional equivalence to LWOP around the demands of the Eighth Amendment as considered in *Contreras*, evaluating section 1170(d)'s distinction for those sentenced to LWOP in an equal protection context requires "an equal protection specific analysis" (*Thompson, supra*, 112 Cal.App.5th at p. 1073) as presented in *Hardin* and *Williams*.

As here, "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, … [t]he only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*Hardin, supra*, 15 Cal.5th at pp. 850–851.) "[W]hen a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that the legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" (*Id.* at p. 847.)

In the context of equal protection, therefore, "[i]nstead of asking whether a [4]0-year-to-life term functions like [LWOP] with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders [under *Graham*], we must ask whether '"a statutory distinction [between LWOP and a [4]0-year-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection."'" (*Thompson, supra*, 112 Cal.App.5th at p. 1074, quoting *Williams, supra*, 17 Cal.5th at p. 123 & citing *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted.)

Although the Attorney General centers his analysis around *Contreras*'s Eighth Amendment formulation of LWOP functional equivalency, we follow *Thompson*'s lead and address appellant's as-applied challenge in the context of the equal protection framework under *Hardin* and *Williams*.

C.     **Rational Basis For Legislature to Treat Juvenile Offenders Sentenced to 40 Years to Life Differently From Juvenile's Sentenced to LWOP**

Appellant argues section 1170 was enacted to "incorporate into the state's sentencing scheme the latest scientific understanding regarding the incomplete brain development of young people and its relationship to criminality and culpability." Based on this legislative purpose, and relying on *Heard*, appellant argues there is no rational reason for limiting section 1170(d) resentencing relief to juvenile offenders serving

25.

LWOP and excluding from relief those defendants serving otherwise lengthy terms for offenses committed when under the age of 18.

The Legislature enacted what is now section 1170(d)(1)(A) in response to "concerns regarding sentences of [LWOP] for juvenile offenders." (*Kirchner, supra*, 2 Cal.5th at p. 1049; see Assem. Com. on Appropriations, Analysis of Sen. Bill. No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, pp. 3–5.) While the legislative history discusses scientific brain research which differentiates juveniles from adults and affects the degree of juvenile offenders' culpability, legislative committee analyses reflect the Legislature's central focus in enacting section 1170(d) was mitigating the *harshest* juvenile punishments—those juveniles whose sentences guaranteed their death in prison because they offered no opportunity for parole.

Specifically, legislative committee reports reflect concerns centered specifically on LWOP, not lengthy juvenile sentences generally. An Assembly Committee on Appropriations bill analysis included contentions of the bill's author and supporters that LWOP for juveniles is a "barbaric" sentence, "counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 2; see *McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 241 ["Where, as here, the author's statements are part of committee materials—and are therefore relayed not merely as personal views, but instead as part of the Legislature's consideration of the bill—they can serve as salient reflections of legislative purpose."].)

Both the Assembly Committee on Appropriations and the Assembly Committee on Public Safety issued analyses that discussed statistics provided by the Senate Bill 9's author that were specifically relevant only to LWOP. For example, both analyses referenced background facts showing "45% of the minors sentenced to LWOP did not personally commit murder, but were convicted of felony murder—as accomplices in a felony during which a murder was committed"; and that recent developments in brain

science "'have proven that youth are far more influenced by group behavior than the same individuals will be as adults'"—"'[u]nsurprisingly, over 75% of the youth sentenced to LWOP acted within a group at the time of their crime.'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 3; see Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, pp. 7–8.)

Also included were background facts provided by the Senate Bill 9's author indicating many of California youth sentenced to LWOP were acting under the influence of an adult—in 70 percent of cases where the youth was not acting alone, at least one codefendant was an adult; and that California "'has one of the worst records in the nation for racial disparity in the imposition of [LWOP] for juveniles. African American youth are sentenced to [LWOP] at over 18 times the rate of white youth. Hispanic youth are sentenced to [LWOP] five times more often than white youth.'" (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, pp. 7–8.) The analysis provided by the Assembly Committee on Appropriations included information taken from a 2007 report by the Center for Law and Global Justice and the Frank C. Newman International Human Rights Law Clinic at the University of San Francisco School of Law that "'LWOP for minors violates customary international law ….'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 4.)

As reasoned in *Thompson*, "[t]his history suggests the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences. Instead a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison." (*Thompson, supra*, 112 Cal.App.5th at p. 1076.) "At the time of enactment, the Legislature could reasonably consider [LWOP] to be the most severe and unjust punishment imposed on juvenile offenders." (*Id.* at p. 1077.) As in *Thompson,* appellant

has not demonstrated how the Legislature's concerns regarding the harshest punishments guaranteeing death in prison apply equally to those sentenced to 40 years to life with parole eligibility at 57 years of age.

Moreover, the legislative history indicates the Legislature planned to proceed "incrementally in addressing the larger problem of excessive punishment of juvenile offenders." (*Thompson, supra*, 112 Cal.App.5th at p. 1076.) The Senate Appropriations Committee's fiscal summary of Senate Bill 9 indicated the law would apply to only 293 inmates in California, and the anticipated fiscal impact was calculated accordingly. (Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010.) Further, the bill was described by supporters as a "'modest and narrowly focused piece of legislation'" given the limited number of inmates the bill was anticipated to affect. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11.)

The Legislature could rationally determine that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, 112 Cal.App.5th at p. 1077.) While this excludes juveniles with lengthy term-of-years sentences that do not guarantee their death in prison, the Legislature is "entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process." (*Hardin, supra*, 15 Cal.5th at p. 866.) "'Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all" [Citation.] Far from having to "solve all related ills at once" [citation], the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination.'" (*Williams, supra*, 15 Cal.5th at p. 125, quoting *People v. Barrett* (2012) 54 Cal.4th 1081, 1110.)

The Legislature's "line-drawing authority and ability to proceed incrementally has been recognized in numerous contexts, not limited to punishing relative culpability more

severely, or to prescribing disparate punishments for different offenses." (*Thompson*, *supra*, 112 Cal.App.5th at pp. 1080–1081, citing *Chatman, supra*, 4 Cal.5th at p. 283; see *People v. Barrett, supra*, 54 Cal.4th at p. 1110 [recognizing Legislature's discretion to proceed incrementally in not authorizing jury trials or require jury advisements in Welf. & Inst. Code, § 6500 commitment proceedings, even though several other commitment schemes include such rights].)  The Legislature's authority to sculpt a solution for a problem rationally perceived to be the most pressing is not subject to a court's "judgment on the wisdom or desirability of [the Legislature's] policy choices." (*Hardin, supra*, 15 Cal.5th at p. 864.)

Appellant argues precluding section 1170(d) relief for juveniles sentenced to a term of 40 years to life is irrational because it has the "'incongruous effect of extending sentencing leniency'" to offenders least deserving of it, while excluding those who committed offenses not warranting LWOP.  (Quoting *Heard, supra*, 83 Cal.App.5th at p. 633.)  But, the Legislature could have rationally differentiated those serving LWOP from those serving 40 years to life, despite potential culpability differences.  Unlike juveniles with term-of-years sentences, those sentenced to LWOP cannot benefit from conduct credits, even if it was earned, to advance a parole date.  "[C]ourts have concluded the Legislature may rationally provide a rehabilitative benefit to a group of offenders who committed more serious crimes, while excluding those convicted of lesser crimes, when the less culpable group may have other avenues for relief." (*Thompson, supra*, 112 Cal.App.5th at p. 1080, citing *Chatman, supra*, 4 Cal.5th at pp. 294–295 & *In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1329.)  Also as part of its line-drawing authority, the Legislature rationally could have distinguished LWOP and 40-year-to-life sentences given differences in terms of their confinement.  "That 'it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration' (*Graham, supra*, 560 U.S. at p. 79), would provide the

Legislature with reason to give [LWOP] juvenile offenders in particular an opportunity to be resentenced to a life with parole sentence." (*Thompson, supra*, at p. 1080.)

Although rejecting equal protection challenges to section 1170(d) as applied to juvenile sentences of 50 years to life for homicide, *Thompson* and *Munoz* acknowledge "tough questions" remain regarding other term-of-years sentences with respect to equal protection challenges to section 1170(d). (*Munoz, supra*, 110 Cal.App.5th at p. 510, review granted; accord, *Thompson, supra*, 112 Cal.App.5th at p. 1081.) Determining what term-of-years sentence will result in the juvenile's death in prison and, thus, becomes rationally indistinguishable from a term of LWOP in light of the Legislature's purposes in enacting section 1170(d), becomes even more difficult where a sentence extends beyond 50 years. "What about 60 to life for a 15-year-old defendant? Or 53 years eight months to life for a 20-year-old defendant?" (*Munoz, supra*, at p. 510, review granted.) Here too, those questions are not presented, and we likewise do not reach them.

In sum, as applied to juvenile offenders sentenced to 40 years to life, appellant fails to demonstrate section 1170(d)'s eligibility limitation has no rational basis and is therefore unconstitutional under the Fourteenth Amendment. (*Williams, supra*, 17 Cal.5th at p. 130, fn. omitted ["We must uphold the Legislature's classification against an equal protection challenge unless 'it fairly can be said that there is no "reasonably conceivable state of facts that could provide a rational basis for the classification."'"].)

### D. Rational Basis to Exclude Young Adults From Recall and Resentencing Under Section 1170(d)

As to his sentence of 50 years to life for the murder he committed when he was 18 years old, appellant maintains excluding him from eligibility under section 1170(b)(1)(A) likewise violates equal protection principles. Appellant argues there is no rational reason for depriving 18-year-old defendants who commit serious

crimes of the same opportunity to prove they have matured and changed as juvenile defendants sentenced to LWOP.

Appellant maintains the Legislature enacted section 1170(d) and section 3051 in response to neuroscientific research on brain development showing the brain does not fully develop until one's mid-20's. While section 3051 extends youth offender parole consideration to juveniles and young adults under the age of 26, only the juvenile is eligible for resentencing under section 1170(d). Given the neuroscientific underpinnings of section 1170(d), appellant contends, there is no rational reason for depriving an 18-year-old the same opportunity to prove they have matured and changed as the 17-year-old sentenced to LWOP.

The Attorney General argues the law has recognized that children are constitutionally different from adults for the reasons explained in *Miller*. Pointing to California courts that have already "affirmed the rationality of drawing a line between minors under the age of 18, and adults over the age of 18," the Attorney General maintains the appellant's argument has already been rejected in *In re Jones* (2019) 42 Cal.App.5th 477 (*Jones*).

In *Jones,* the defendant sought recall and resentencing relief under section 1170(d) for a murder and other offenses he committed when he was 19 years old. He argued section 1170(d) violated his right to equal protection of the law because it did not apply to youthful offenders between the ages of 18 and 25 years old. (*Jones, supra*, 42 Cal.App.4th at p. 480.) The defendant maintained the underlying rationale for section 1170(d) recall and resentencing relief was that young people were developmentally and neurologically different from older offenders, and that young adults, like juveniles, have the same developing brains, lack maturity, and have the same increased potential for rehabilitation. (*Jones, supra*, at p. 481.) In rejecting the defendant's argument, the court reasoned that even assuming adult LWOP offenders under the age of 25 are similar to juvenile LWOP offenders "in the sense that their brains

31.

are not fully developed," it was within the province of the Legislature to draw a line of inclusion under section 1170(d). (*Jones, supra*, at p. 482.) The court reasoned the "Legislature could reasonably decide that for those convicted of LWOP crimes, the line should be drawn at age 18, rather than at some later date when the brain is fully developed. Drawing a bright line at age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes." (*Id.* at p. 483.)

We agree. While young adults over the age of 18 also experience continued cognitive development, the Legislature's stated concerns for enacting section 1170(d) were focused on juveniles, not young adults, sentenced to LWOP. While recognizing that brain development continues into young adulthood, the Legislature could have rationally concluded *juveniles* subjected to the harshest punishment were the priority in addressing the issue, particularly because juveniles could be rationally viewed as even less culpable than young adults and have the "greatest prospects for reform." (*Miller, supra*, 567 U.S. at p. 471.) As explained in *Williams,* "the Legislature may institute reform in an area of law in an 'incremental and uneven manner' without having to '"choose between attacking every aspect of a problem or not attacking the problem at all."'" (*Williams, supra*, 17 Cal.5th at p. 135.) "Equal protection 'does not prohibit the Legislature from regulating certain classes of cases in which the need is deemed most evident.'" (*Ibid.*)

Appellant has not demonstrated the Legislature had no rational basis for making a distinction between juveniles and young adults under section 1170(d), and thus fails to establish section 1170(d) violates his right to equal protection under the Fourteenth Amendment.

**DISPOSITION**

The trial court's order is affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.